IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHNATHAN LACY, KENNETH FARRIS, )
MARQUIS BOWERS, MAURICE )
BOSTON, KEVIN DAWSON, individually )
and for all others similarly situated, )
 )
   Plaintiffs, ) No. 14 C 6259
  v. )
 ) Judge Robert W. Gettleman
THOMAS DART, SHERIFF OF COOK )
COUNTY, COOK COUNTY, )
ILLINOIS, SGT. JOHNSON, CORRECTIONAL )
OFFICER NAWARA, CORRECTIONAL )
OFFICER LOPEZ, CORRECTIONAL )
OFFICER WILSON, )
 )
   Defendants. )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiffs Jonathan Lacy, Kenneth Farris, Marquis Bowers, Maurice Boston, and Kevin

Dawson, filed a putative class action amended complaint against defendants Thomas Dart,

Sheriff of Cook County, Illinois (the "Sheriff"), Cook County, Illinois (the "County"), Sergeant

Johnson, and correctional officers Nawara, Lopez, and Wilson,[2] alleging violations of section

202 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, section 504 of the

Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794(a), and 42 U.S.C. § 1983. Following oral

---

[1] This opinion contains both findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent any Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. See Miller v. Fenton, 474 U.S. 104, 113–14 (1985).

[2] The individual sergeant and officers were sued as a part of plaintiff Lacy's excessive force claim only. These claims, however, have been voluntarily dismissed without prejudice. See doc. no. 193.

arguments and an extensive evidentiary hearing on plaintiffs' request for preliminary injunctive relief, this court certified a class under Fed. R. Civ. P 23(b)(2) of "All Cook County Jail detainees who have been assigned and currently use a wheelchair." Lacy v. Dart, No. 14-C-6259, 2015 WL 1995576 (N.D. Ill. April 30, 2015). Since originally seeking a preliminary injunction in September 2014, plaintiffs have sought various types of relief. See doc. nos. 43, 120, 143, 162. In their final reply, however, plaintiffs ask the court to:

> enter a final declaratory judgment that detainees are being denied rights secured by the ADA and the Rehabilitation Act when they are transported to and from the Jail and court appearances and enter a permanent injunction requiring the Sheriff to change Order 11.14.35.0 to require: Employees of the Sheriff *shall* push each detainee who is using a wheelchair up and down ramps in all courthouses. (Emphasis included).

In the alternative, plaintiffs request that the court "grant this relief in the form of a preliminary injunction." For the reasons discussed below, plaintiffs' motion for injunctive relief is granted in part and denied in part.

## BACKGROUND

Plaintiffs, like all Cook County Jail detainees, attend court periodically in connection with their underlying criminal cases at either the Leighton Criminal Courthouse in Chicago ("Leighton") or one of five suburban courthouses: Maywood; Markham; Skokie; Rolling Meadows; and Bridgeview. Plaintiffs complain that as wheelchair-using detainees they are subject to numerous ADA and Rehab Act violations in connection with their criminal court appearances. Specifically, plaintiffs allege that their rights are violated when being transported to and from court and while waiting at the courthouses for their cases to be called. Plaintiffs contend that courthouse ramps, holding cells, and transport vans are not compliant with the ADA

and Rehab Act's architectural accessibility standards (or "structural requirements") and that defendants have not provided reasonable accommodations to overcome structural barriers.

The court held seven days of hearings on plaintiffs' motion for a preliminary injunction. At the hearings, the evidence focused on a number of subjects, including: (1) the accessibility of the courthouses under current conditions; (2) accommodations defendants provide to overcome structural barriers; (3) construction the County was undertaking contemporaneously with the hearings to remove structural barriers; (4) the credibility of the testifying named plaintiffs and putative class members; (5) the County's future plans to make the courthouses compliant with current ADA structural requirements; and (6) the applicability of the ADA and Rehab Act's structural requirements to the courthouses. Since the evidentiary hearing concluded on February 17, 2015, the parties have submitted numerous status reports concerning defendants' compliance with existing ADA-policies, implementation of new ADA-policies, and ADA-focused construction at all six courthouses.

## DISCUSSION

### A.      Defendants' Statutory Obligations

Plaintiffs claim that defendants have violated section 504 of the Rehab Act and Title II of the ADA. Section 504 prohibits a "qualified individual with a disability" from being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," as a result of his disability. 29 U.S.C. § 794(a). Similarly, Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."  42 U.S.C. § 12132.  Given that the analysis under each

statute is the same (with the exception that the Rehab Act requires receipt of federal funding) and

that plaintiffs can recover under only one of the statutes, the court will analyze the two statutes

as one, referring predominantly to the ADA.  See Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 671-

72 (7th Cir. 2012).

To succeed on a Title II claim, a plaintiff must establish: (1) that he is a "qualified

individual with a disability"; (2) that was denied "the benefits of services, programs, or activities

of a public entity," or otherwise was discriminated against by the public entity; and (3) that such

denial or discrimination was "by reason of" his disability.[3]  Love v. Westville Corr. Ctr., 103

F.3d 558, 560 (7th Cir. 1996); 42 U.S.C. § 12132.  Title II's implementing regulations provide

that "[a] public entity shall make reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination on the basis of disability."

28 C.F.R. § 35.130(b)(7).  Thus, discrimination can be established by evidence that the

defendant refused to provide a reasonable accommodation.  Washington v. Indiana High Sch.

Athletic Ass'n, Inc., 181 F.3d 840, 847 (7th Cir. 1999).

Title II's "reasonable modification requirement can be satisfied in a number of ways."

Tennessee v. Lane, 541 U.S. 509, 532 (2004).  Buildings constructed or renovated after 1992,[4]

must comply with specific architectural accessibility standards.  28 C.F.R. § 35.151.  For

---

[3] To recover damages under either statute, which is currently not an issue before the court, a plaintiff is required to prove that the defendant intentionally discriminated.  CTL ex rel. Trebatoski v. Ashland School Dist., 743 F.3d 524, 528 n.4 (7th Cir. 2014).

[4] As discussed below, the Rehab Act's architectural accessibility standards have a different effective date than the ADA.

buildings constructed before 1992, "a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." Id. (citing 28 C.F.R. § 35.150(b)(1)). The parties agree that the ADA and Rehab Act's structural requirements do not apply to the Leighton, Maywood, Markham, and Skokie courthouses because of their early construction dates. Accordingly, defendants' statutory obligations with respect to those courthouses are limited to providing pretrial detainees with reasonable accommodations that overcome structural barriers. See id.

Plaintiffs argue, however, that the Rehab Act's structural requirements were applicable to the Rolling Meadows and Bridgeview courthouses at the time of their construction in the late 1980s. Plaintiffs first argue that the Uniform Federal Accessibility Standards ("UFAS") imposed structural requirements on the two courthouses. The parties agree that as of March 7, 1988, the Rehab Act required buildings constructed or renovated by a state or municipality to comply with the UFAS. 28 C.F.R. 42.522(b). According to the County, because the Rolling Meadows courthouse was fully constructed in 1987, the building did not have to be constructed in compliance with the UFAS.

The County argues that while the Bridgeview courthouse was not opened until 1989, its construction, including design and permitting, began in 1986, thereby making the UFAS inapplicable. Defendants do not cite any authority for their position that "the latest event that could trigger compliance with [the UFAS] is the beginning of construction of the new facility," nor could the court find any such authority. However, the court does note that under the ADA "the commencement of physical construction," is "the triggering event for application of the

2010" structural requirements "for entities covered by title II." See *Guidance on the 2010 ADA Standards for Accessible Design*, "State and Local Government Facilities: Guidance on the Revisions to 28 CFR 35.151," U.S. Department of Justice, Sept. 15, 2010, http://www.ada.gov/regs2010/2010ADAStandards/Guidance2010ADAstandards.htm.

Given the apparent inapplicability of the UFAS to the two courthouses, plaintiffs also argue that prior to the Rehab Act's adoption of the UFAS in 1988, the Act imposed other accessibility standards called the American National Standard Specifications for Making Buildings and Facilities Accessible to, and Usable by, the Physically Handicapped ("ANSI requirements"). 28 C.F.R. § 45.522 (1980). According to plaintiffs, the 1980 ANSI requirements called for the same maximum slope for ramps as today's statutory construction standards. As such, plaintiffs argue that despite the Bridgeview and Rolling Meadows' late-1980s construction dates, the County was required to comply with the slope standards specified in the 1980 ANSI requirements when constructing the ramps at both courthouses.

The court is not persuaded by either of plaintiffs' arguments. The Rehab Act prohibits "discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The Rehab Act defines "program or activity" as the operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A). The defendant County, which is responsible for construction and maintenance of the courthouses at issue, does not fit this definition. Instead, as found in <u>Schroeder v. City of Chicago</u>, 715 F. Supp. 222, 225 (N.D. Ill. 1989), the County "embodies an entire local government," and "is not a department or instrumentality of a local government." Through the Civil Rights Restoration Act of 1987, Congress intended "to include federally funded institutions

like hospitals or universities within the amended definition of 'program or activity.' By contrast, nothing in the amendment's legislative history suggests that Congress contemplated classifying an entire municipality . . . as a 'program or activity.'" Id. at 225; see also Hodges by Hodges v. Public Bldg. Com'n of Chicago, 864 F. Supp. 1493, 1505-06 (N.D. Ill. 1994). As such, the County's statutory obligations under the ADA with respect to all six courthouses, including the Rolling Meadows and Bridgeview courthouses, are limited to providing pretrial detainees with reasonable accommodations that overcome structural barriers. See Lane, 541 U.S. at 532.

## B. Evidentiary Record[5]

### i. Transport Vans

Plaintiffs complain that their rights pursuant to the ADA are violated when they are transported to and from court appearances at the suburban courthouses in the Sheriff's transport vans. According to plaintiffs, correctional officers employed by the Sheriff: (1) transport more wheelchair-using detainees at one time than there are ADA-compliant wheelchair straps; (2) fail to secure wheelchair-using detainees with ADA straps during transport; and (3) at other times, fail to properly secure wheelchair-using detainees with the ADA-compliant straps during transport. Plaintiffs allege that these violations have resulted in injuries to some wheelchair-using detainees.

The evidentiary record establishes that defendant Sheriff utilizes four handicap accessible vans to transport wheelchair-using detainees to and from court appearances at the suburban

---

[5] The evidentiary record currently before the court includes the seven days of hearings on plaintiffs' motion for injunctive relief and the many status reports and additional evidence that the parties have submitted since the last hearing date on February 17, 2015. Given this voluminous record, the court does not address every piece of evidence submitted by the parties, but instead focuses on what it finds to be most relevant.

courthouses.  The Lieutenant of Transportation for the Sheriff, Grant Martin, testified that two of the vans were purchased in 2014 and that the other two vans had been in service for approximately four or five years.  At the time the new vans were purchased, Lieutenant Martin, along with four sergeants and two officers, were trained on how to properly use the ADA restraints in each van.  The other Sheriff's officers were instructed on proper use of the vehicles during morning roll call.

Lieutenant Martin testified that two Sheriff's officers are assigned to each van during the transport of wheelchair-using detainees.  There are two S-hook straps attached to the floor of the vans that are secured to the wheels of a detainee's wheelchair, and once the straps are tightened they "keep the wheelchair immobile."  There is also a traditional seatbelt that goes across the detainee's body.  The officers assigned to each van are required to inspect the vans, including verifying that the ADA equipment is present and functional, each morning before transporting any detainees.  Lieutenant Martin testified that two to three wheelchair-using detainees are transported in the vans at one time, depending on how many ADA straps are available.  While the new vans are pre-equipped with two sets of straps, additional straps can be added to the vans to accommodate a third wheelchair-using detainee.  Wheelchair-using detainees are not handcuffed during transport to and from court.  According to Lieutenant Martin, detainees can remove and adjust both the seat belt and S-hook straps without assistance.  Lieutenant Martin testified that he has received approximately four to six grievances in the last two months from wheelchair-using detainees concerning van transport and that he had not received any such grievances previously.

Plaintiffs' ADA expert, Maureen Reagan, testified that she inspected two of the transport vans used by the Sheriff to take wheelchair-using detainees to court proceedings – one older model and one newer model. Reagan testified that in one van there were enough restraints to transport two wheelchair-using detainees at once, while the other van had a single set of S-hook straps. Reagan testified that with the exception of "lacking a handhold inside," the vans were compliant with the 2010 ADA accessibility standards. The vans had ADA-compliant lifts, hooks to secure each side of a wheelchair, and seatbelts.

Plaintiffs submitted six witnesses – Harold Vaughn, Marquis Bowers, Kevin Dawson, Shelly Gaston, Daryl Harper, and Cornelius Purnell – who testified about being transported to and from court in the Sheriff's transportation vans. The six wheelchair-using detainees testified about a myriad of experiences, but collectively complained about not having their wheelchairs secured at all, and on other occasions, being strapped in, but not securely, during transport to court appearances. Gaston and Harper complained that even when they are properly restrained, the S-hook straps are too old to ensure that they will not be shaken around during the trip. Bowers, Vaughn, Purnell, and Dawson testified to falling out of their wheelchairs or tipping over in their wheelchairs during transport as a result of not having their wheelchairs secured. The detainees also testified to witnessing other wheelchair-using detainees fall out of their wheelchairs during transport.

In addition to not being secured in the vans, Dawson and Purnell testified to being transported with as many as four other wheelchair-using detainees at one time over the past two years. Both detainees, however, testified that on such occasions two detainees would be taken out of their wheelchairs and placed in the van's seats. According to Dawson and Purnell, this

practice had recently changed, and over the past several months they had been transported with only one other wheelchair-using detainee when going to and coming from court.

The detainees testified to the proper way Sheriff's employees are supposed to secure wheelchair-using detainees into the vans, with an S-hook strap attached to each wheel of the detainee's wheelchair and a seatbelt across each detainee's chest. However, the detainees testified that they were unable to secure or unsecure themselves in the vans. Purnell testified that despite the fact that video evidence showed him picking-up an object from the floor while seated in his wheelchair, he cannot tighten or loosen the van's ADA straps because, "[f]irst of all, it's the officers' job to do that. And plus . . . [he doesn't] know how to work the belt." Similarly, Bowers admitted that the latches that tighten the S-hook straps are only a few inches from his hands, but that he is unable to tighten or loosen the straps himself because "he doesn't know how to do the straps." Video evidence, however, showed Bowers coming out of a transport van on November 7, 2014, – a day on which Bowers testified to having been properly secured within the van – without a Sheriff's officer helping him undo the ADA straps.

Lieutenant Martin testified that an investigation into whether Dawson was properly secured during transport on January 6, 2015, revealed that he had unstrapped himself upon arrival to the Skokie courthouse. To address the problem of wheelchair-using detainees unstrapping themselves while in the transportation vans, the Sheriff's ADA Coordinator, Marlene Fuentes, testified about a notice she began drafting in February 2015 to warn detainees against removing the ADA straps while in the vans. Fuentes explained that she intended to place the notice in each of the Sheriff's wheelchair accessible vans.

### ii.     Ramps

When attending court at any of the five suburban courthouses, wheelchair-using detainees encounter ramps between the loading dock where they are deposited by the transportation van and the courthouses' lower-level holding cells.  Similarly, detainees with appearances at the Leighton courthouse maneuver a ramp in the tunnel between the Cook County Jail and the courthouse's lower-level staging area.  The parties agree that the ramps leading to the lower-level holding cells at each of the six courthouses are not compliant with current ADA slope or landing requirements, and that a reasonable accommodation is for defendants' employees to push wheelchair-using detainees up and down the ramps.  Although defendants' witnesses testified that there is a policy and practice requiring wheelchair-using detainees to be pushed up and down the courthouse ramps, plaintiffs complain that wheelchair-using detainees are frequently unassisted.

Plaintiffs presented three witnesses – Dawson, Harper, and Purnell – who testified that they are not consistently pushed up and down the courthouse ramps.  Harper testified that he normally pushes himself up the ramp at the Markham courthouse, but that "sometime[s] [he'll] get a nice [officer] that will help [him]."  Harper has never asked for assistance with maneuvering the Markham ramp.  Purnell testified that he occasionally is given assistance with the ramp at the Bridgeview courthouse, but that nine out of ten times over the last six months he was not assisted.

Dawson complained that he rarely receives assistance going up and down the Skokie and Leighton courthouse ramps.  At least five videos (dated December 30, 2014, January 6, 2015, April 2, 2015, April 3, 2015, and August 4, 2015) submitted by plaintiffs show Dawson using the

ramps without assistance. Video footage from December 30, 2014, and April 2, 2015, depicts Dawson maneuvering up and down the Leighton courthouse ramp unassisted (despite allegedly requesting help on April 2, 2015). Video evidence from August 4, 2015, shows Dawson rolling himself down the Leighton courthouse ramp. The videos submitted by plaintiffs from Dawson's April 3, 2015, visit to the Leighton courthouse show him both receiving and not receiving assistance up and down the ramps.

Although video footage from the Skokie courthouse ramp area on January 6, 2015, depicts Dawson pushing himself up the ramp, video footage from the loading dock area shows Dawson leaving the loading dock without the guards. Lieutenant Martin testified that because operation of the van lift requires the vehicle to remain on, Sheriff's officers must secure the transport van before escorting detainees to the lower-level holding cells. According to Lieutenant Martin, it is possible for a detainee to leave the loading dock area while the officers are securing the vehicle.

Some of the videos submitted by plaintiffs also depict Dawson receiving the assistance he denies obtaining. For example, on August 24, 2015 (long after the hearings had concluded), plaintiffs moved to submit additional video evidence of three occasions on which Dawson was allegedly not assisted with the ramps. However, in two of the three videos (dated July 16, 2015, and August 4, 2015), Dawson was provided assistance going up the courthouse ramps. Bowers and Farris (who was called as a witness by defendants) both testified to always receiving assistance when maneuvering the ramps at the Maywood and Bridgeview courthouses. Gaston did not testify concerning whether he is routinely given assistance with the ramp at the Markham courthouse, but did testify to being helped up the ramp on December 10, 2014.

James Banks, Assistant Chief of the Leighton courthouse, testified that it is policy and practice for court services officers to push wheelchair-using detainees up and down the ramps at the Leighton courthouse, but that most of the time detainees do not want assistance. Likewise, both Lieutenant Martin and ADA Coordinator Fuentes testified that it is the Sheriff's policy and practice to push wheelchair-using detainees up and down the ramps at all of the courthouses. Fuentes testified that she has conducted training on this policy, and Lieutenant Martin testified that he has reminded the Sheriff's officers of the policy at least twice a week during morning roll call over the past year.

The first ADA complaint Fuentes received concerning a wheelchair-using detainee not receiving assistance with the courthouse ramps was on November 12, 2014, from Dawson. As with the notices to be placed in the transport vans, Fuentes began drafting a notice in February 2015 warning wheelchair-using detainees against traversing courthouse ramps without the assistance of a Sheriff's or court services officer. Fuentes testified that she planned on posting these notices at the top and bottom of the ramps at each of the six courthouses. On March 13, 2015, the Sheriff issued a general order ("Sheriff's Order 11.14.35.0"), effective March 27, 2015, stating that "When practicable, [Sheriff's officers] shall provide assistance to wheelchair-bound subjects who are in CCSO custody," including "[p]ushing subjects up and down ramps in CCSO facilities."

### iii.     Holding Cells

Plaintiffs complain that the holding cells wheelchair-using detainees are housed in while awaiting appearances at all of the six courthouses are not accessible, and that defendants have not provided reasonable accommodations to overcome structural barriers in the cells.

Specifically, plaintiffs contend that: (1) the lower-level holding cells at the suburban courthouses do not have accessible bathroom facilities; (2) none of the holding cells adjacent to the courtrooms in any of the six courthouses have accessible toilets; and (3) there is no accessible toilet facility in bullpen 34/5, where detainees are held prior to being transported to the Leighton courthouse. Defendants do not dispute that the holding cells at all six courthouses are not compliant with the 2010 ADA architectural accessibility standards. However, defendants contend that they have provided reasonable accommodations to overcome any structural barriers, and beyond this statutory obligation, have begun construction to make holding cells at each of the six courthouses compliant with the current accessibility requirements.

### 1.     Leighton Courthouse

Since at least December 2014, wheelchair-using detainees attending court at the Leighton courthouse are brought from their living quarters in the morning to bullpen 34/5 at the lower-level exit of Division 5 of the Cook County Jail. Originally, bullpen 34/5's bathroom facility consisted of a toilet/sink combination, without grab bars. In May 2014, ADA Coordinator Fuentes placed a work order for grab bars to be placed in bullpen 34/5, which were installed in November 2014. ADA Compliance Project Director for Cook County, Michael Gumm, testified that he became involved with bullpen 34/5 improvements in September or October of 2014. On October 2, 2014, Gumm drafted a memo with a scope of work to make bullpen 34/5 compliant with the 2010 ADA standards. At the time of Gumm's testimony on January 20, 2015, the toilet in bullpen 34/5 was ADA-compliant, but the newly installed sink was too close to the toilet and did not comply with ADA clearance standards. By the end of March 2015, a new, ADA-compliant sink was installed in bullpen 34/5.

From bullpen 34/5, wheelchair-using detainees are brought through a tunnel to a staging area below the Leighton courthouse, known as "the bridge." Wheelchair-using detainees are staged outside of a large holding cell in the bridge area until their court cases are called. While a large holding cell in the bridge has toilet facilities, it is reserved for non-wheelchair-using detainees who are held in the cell. If a wheelchair-using detainee wishes to use the restroom while staged in the bridge, he must request that a court services officer escort him to a bathroom in what is referred to as the "old female lockup" area, which is adjacent to the bridge.

According to Assistant Chief Banks, there is a sign posted in the bridge area alerting wheelchair-using detainees to the fact that they can request to use the old female lockup restroom. The old female lockup bathroom has a combination toilet/sink, over which a portable commode chair was placed in the spring of 2014. In January 2015, a privacy wall that was next to the toilet/sink combination was torn down and a grab bar was added to the wall next to the toilet to make the facility more accessible. Gumm testified that a grab bar could not be added behind the toilet/sink combination, as required by the 2010 ADA standards, because of structural reasons. Defendants argue that these adjustments make the restroom accessible to wheelchair-using detainees.

Assistant Chief Banks testified that in April 2014 he toured the Leighton courthouse and observed that there are no handicap accessible toilet facilities in the holding cells behind the courtrooms. Banks communicated these observations to his supervisor, Chief of Courts Eddie Avant, and Leighton building staff in an April 19, 2014, memorandum. The memo, which was read at the following ten roll calls, instructed court services officers to, "[i]n the event of emergency," escort a wheelchair-using detainee from the lockup area to a public, ADA-

compliant restroom.  Banks' memo articulated that "[t]hese measures are to be used only in emergencies until the facility is ADA compliant."  Banks testified that since the memo was published, he was not aware of any detainee being taken to a public restroom.

According to Banks and ADA Coordinator Fuentes, the policy and practice of the court services officers at the Leighton courthouse is to bring wheelchair-using detainees directly from the bridge area to their courtroom and back down again to the bridge area immediately following the court appearance.  Dawson, however, testified that on December 4, 2014, he was held in a holding cell outside of his courtroom in the Leighton courthouse for over an hour.  In addition, video footage from the Leighton courthouse on December 30, 2014, depicts Dawson waiting in that same holding cell for approximately two hours after his court appearance.

Dawson testified that on November 5, 2014, while waiting in the bridge, he requested that an officer take him to the old female lockup bathroom.  According to Dawson, the officer told him that she did not know about an old female lockup restroom.  Instead, Dawson was escorted to bullpen 34/5.  Dawson testified that he could not use the restroom in bullpen 34/5 because it did not have grab bars.  As a result, Dawson testified that he soiled himself prior to going to court.  Dawson filed a grievance about this incident, to which Fuentes responded that grab bars had subsequently been installed in the bullpen.  When Dawson returned to court on December 4, 2014, he observed that grab bars were now in bullpen 34/5.  However, he testified that despite the grabs bars it was still difficult for him to use the toilet because it was too low.

### 2.      Suburban Courthouses

ADA Coordinator Fuentes testified that in June or July of 2014 she inspected the detention areas at all of the suburban courthouses.  During her tour, Fuentes observed that all of

the bathroom facilities in the holding cells at each of the five suburban courthouses had combination toilet/sinks. In addition, with the exception of the Maywood courthouse where two upper-level holding cells were compliant with current ADA standards, none of the bathroom facilities had grab bars. Following her tour of the suburban courthouses, and after receiving a grievance from a wheelchair-using detainee about not being able to access the toilet facilities at a suburban courthouse, Fuentes delivered portable commode chairs provided by the Cermak Infirmary to each of the suburban courthouses.

Fuentes testified that a holding cell in the lower-level of each suburban courthouse was chosen for wheelchair-using detainees to be held in. A portable commode chair was placed in each of the selected lower-level holding cells. Fuentes then posted signs alerting detainees at each of the five courthouses that commode chairs were available upon request and also spoke to the wheelchair-using detainees in their housing units about being able to request a commode chair. Fuentes also instructed court services officers to provide wheelchair-using detainees with commode chairs when they are placed in a suburban court holding cell. Fuentes, however, did not train the officers on how to assist a detainee using a commode chair, even though the chairs have a manufacturer's warning on them requiring that they be used with assistance.

Fuentes testified that she did not supply the upper-level holding cells with commode chairs because the Sheriff's policy at the suburban courthouses is, as it is at the Leighton courthouse, to escort wheelchair-using detainees up to their respective courtrooms immediately before their case is called and escort them back to the lower-level holding cells immediately thereafter. However, Purnell testified to being kept in a holding cell outside of his courtroom at the Bridgeview courthouse for up to two hours before his court appearance.

Plaintiffs' witnesses collectively testified to the bathroom facilities being inaccessible in the suburban courthouses. Even with the commode chairs in the lower-level holding cells, the witnesses complained that they could not safely transfer onto the chairs because some of the commode chairs did not have removable arms. Moreover, the detainees testified that because the chairs were not secured to the floor, they shift when being mounted. While some of the detainees were able to access the holding cell sinks, others testified that they could not use the sinks at all, or only with difficulty. Gaston testified that during his December 10, 2014, visit to Markham he was provided with a commode chair upon request, but that the court services officer told him that he could not help him use the chair. The officer, however, took Gaston to a public, accessible restroom on the lower-level of the courthouse.

Dawson testified to being able to use the toilet with the commode chair in the lower-level Skokie holding cell, but complained that transferring to the chair was difficult and not always successful. Video footage from November 18, 2014, depicts Dawson transferring to a commode chair; however, he testified that he could not use the facility because the chair shifted away from the toilet while he was transferring. Dawson testified that he cannot use the combination toilet/sink in the holding cell outside of his courtroom at the Skokie courthouse because his wheelchair does not fit past the privacy glass next to the toilet.

Harper testified that while at the Markham courthouse on December 10, 2014, he was provided with a commode chair, but that the officer told him that he could not provide assistance using the chair. Harper testified that he could not use the bathroom facilities, even with the commode chair, because the handrails on the commode chair do not allow for a side transfer.

Harper testified to defecating on himself five months prior to his testimony because he was unable to use the toilet in the Skokie holding cell.

Video evidence from October 21, 2014, showed Purnell transferring to a commode chair in a lower-level Bridgeview courthouse holding cell. Although Purnell was eventually able to make the transfer, it took a substantial amount of time. As with the other detainee witnesses, Vaughn testified that the commode chair available at the Markham courthouse was not stable when trying to transfer.

### iv.     ADA Construction

The evidentiary record establishes that defendants began contemplating the need for ADA-related improvements in detention areas at the six courthouses prior to the filing of the instant lawsuit in August 2014. In February 2014, the Sheriff hired ADA Coordinator Fuentes, who was responsible for handling all inmate-related ADA issues for the Sheriff, ensuring that the Sheriff's policies and practices were compliant with the ADA, and conducting regular assessments of Cook County Department of Correction facilities and equipment for ADA-compliance. Fuentes began conducting ADA-related training for Sheriff's employees in March 2014. In July 2015, Fuentes resigned from her position as ADA Coordinator. The court has been informed by the Sheriff that he is currently searching for an individual to fill the position.

In June 2014, the County hired Gumm to act as the County's ADA Compliance Project Director. In this position, Gumm focuses on implementing ADA improvements, including developing ADA-compliant designs for both larger capital projects and smaller facilities management projects. Gumm testified that when he first began working for the County in June

2014, he assisted the Director of Capital Planning in developing a 2015 capital improvement plan for ADA-renovations of the detention areas at the Leighton courthouse.

In November 2014, the Cook County Board approved $8.3 million in funding for ADA renovations to the Leighton courthouse holding cells as a part of its 2015 budget. Since the evidentiary hearing, defendant County has undertaken a number of construction projects to bring the detention areas at both the Leighton and suburban courthouses into compliance with the 2010 ADA accessibility standards. On September 3, 2015, the County submitted an affidavit by ADA Project Coordinator Gumm attesting to the status of the ADA construction at each of the six courthouses. According to Gumm's affidavit, as of September 1, 2015, the County had executed a contract with Prima Engineering for the renovation design of the holding cells in the lower and upper-levels at the Leighton courthouse.

Gumm testified that the Leighton courthouse construction will be completed in three phases over the course of 34 months (10 months for design and 24 months for construction). The first phase of construction will renovate the lower level/bridge holding cells, the second phase will renovate the holding cells behind the courtrooms on floors one and two, and the third phase will renovate the holding cells behind the courtrooms on floors three through seven. As specified in the County's Request for Proposal No. 1555-14596, the Leighton renovations include "removing cell doors, cell walls, and plumbing fixtures & related piping, the reconfiguration of cell layouts, plumbing fixtures & piping . . . . in compliance with" current ADA structural requirements.

As of September 1, 2015, renovation of the lower-level holding cells at the Skokie, Rolling Meadows, and Markham courthouses had been completed, making the cells compliant

20

with the 2010 ADA accessibility standards.  Renovations to widen the lower-level holding cell doors at the Markham courthouse had also begun.  In addition, the affidavit asserts that a purchase order had been issued for a new ADA-compliant dock and intake ramp at the Skokie courthouse, with installation projected to take place in October 2015.  According to the affidavit, a contractor was in the process of providing cost estimates to the County for new docks and intake ramps at the Rolling Meadows and Markham courthouses, with installation projected to take place in the winter of 2015.

Gumm further asserts in the affidavit that renovations on the lower-level holding cell bathroom facilities at the Maywood and Bridgeview courthouses were projected to be completed in September 2015.  As with the other suburban courthouses, as of September 1, 2015, a contractor was in the process of providing costs to the County for new ADA-compliant docks and intake ramps at both courthouses, with installation projected to take place in the winter of 2015.

## C.      Declaratory Judgement

Plaintiffs request that regardless of what injunctive relief – preliminary or permanent – that the court imposes, it find that "detainees are being denied rights secured by the ADA and the Rehabilitation Act when they are transported to and from the Jail and court appearances." Plaintiffs argue that "[t]he evidence presented at trial demonstrates that wheelchair-using detainees at the Cook County Jail are discriminated against when they are transported to and from court and while they wait at the courthouse for their cases to be heard."  According to plaintiffs, defendants' efforts to accommodate wheelchair-using detainees in overcoming structural barriers at the six courthouses are inadequate.

To succeed on a Title II claim, a plaintiff must establish: (1) that he is a "qualified individual[6] with a disability"; (2) who was denied "the benefits of services, programs, or activities of a public entity," or otherwise was discriminated against by the public entity; and (3) that such denial or discrimination was "by reason of" his disability.[7] <u>Love</u>, 103 F.3d at 560. As previously discussed by this court, plaintiffs and the class members they represent are qualified individuals with a disability. <u>Lacy</u>, 2015 WL 1995576 at *2. Because defendant Sheriff provides plaintiffs and class members with wheelchairs to use during their court proceedings, they "are regarded as having an impairment, or at least have a record of impairment," <u>id</u>., and therefore are considered persons with disabilities pursuant to § 12102(1) of the ADA. Likewise, plaintiffs' constitutional right to attend their criminal court proceedings, <u>Lane</u>, 541 U.S. 509, ensures that they are qualified to make use of the services, programs, and activities in question.

Transportation to court appearances and the facilities made available to detainees at the six courthouses are services provided by defendants within the meaning of the ADA. <u>See, e.g.</u>, <u>Jaros</u>, 684 F.3d at 672 (showers and meals made available to inmates qualify as a program or activity); <u>Bramlett v. Dart</u>, No. 14-C-5939, 2015 WL 4148711, at *3 (N.D. Ill. July 9, 2015) (showers, toilets, and transportation made available to inmates are services). Defendants,

---

[6] Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meet[ ] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

[7] As noted previously, to recover under section 504 of the Rehab Act, a plaintiff must also establish receipt of federal funds. <u>Jaros</u>, 684 F.3d at 671. In addition, to recover damages under either statute, a plaintiff is required to prove that the defendant intentionally discriminated. <u>CTL</u>, 743 F.3d at 528 n.4.

however, rely on Wagoner v. Lemmon, 778 F.3d 586 (7th Cir. 2015), to argue that plaintiffs'

allegations do not amount to a denial of these services.  In Wagoner, the Seventh Circuit held

that the plaintiff's complaints about "longer waits and humiliation, as when he had to crawl off

the regular [Illinois Department of Corrections] van because it did not accommodate his

wheelchair . . . . do not amount to a denial of services within the meaning of either" the ADA or

Rehab Act.  Id. at 593.  According to defendants, "[t]here is no evidence suggesting [they]

denied access to any activities, programs, or services."

     Wagoner, however, is distinguishable from the present case because the Seventh Circuit

in Wagoner held that the plaintiff's allegations of inconvenience and humiliation did not

sufficiently allege a denial of access to services.  Id.  Here, as in Bramlett, plaintiffs argue that

"defendants failed to make reasonable accommodations to provide [them] with access to critical

services . . . on the same basis as other inmates."  Bramlett, 2015 WL 4148711 at *3; see also

Jaros, 684 F.3d at 672 ("The refusal to accommodate [plaintiff's] disability kept him from

accessing meals and showers on the same basis as other inmates.").  Moreover, failing to provide

a reasonable accommodation, which plaintiffs are alleging here, is sufficient to establish

discrimination under Title II.  See Washington, 181 F.3d at 847.

    **i.**    **Transport Vans**

     With respect to the transport vans, the court is not convinced that Sheriff's employees,

and not the detainees themselves, are responsible for failing to adequately secure wheelchair-

using detainees during transport to and from court appearances.  The record establishes that the

Sheriff uses four ADA-compliant vehicles to transport wheelchair-using detainees and that

Sheriff's personnel are trained on how to use the ADA restraints in the vehicles and are required

to inspect the equipment prior to use. While six witnesses testified to not being secured properly in the vans, the court questions the credibility of their testimony on this topic given the fact that the witnesses knew how the ADA straps are supposed to be attached to their wheelchairs, but denied knowing how to secure the straps themselves. Unlike with the ramps and holding cells, the witnesses' testimony was not supported by other evidence, such as video footage, calling into question the Sheriff's practice of securing wheelchair-using detainees prior to transport. Instead, video evidence of Bowers coming out of the transport van without assistance on a day he testified to being properly restrained supports Lieutenant Martin's testimony that detainees can secure and un-secure themselves within the transport vans.

### ii.   Ramps

The evidentiary record, however, establishes that plaintiffs' rights under the ADA have been violated in the past with respect to the courthouse ramps. As discussed above, plaintiffs have submitted video evidence, including video footage taken as recently as August 4, 2015, of wheelchair-using detainees not being pushed up and down courthouse ramps. Although defendants presented evidence that it is their policy and practice to assist wheelchair-using detainees maneuvering the courthouse ramps as a reasonable accommodation to overcome the ramps' steep slopes, such a policy can qualify as a reasonable accommodation only if it is consistently practiced. The evidence here, however, establishes that the policy was not in fact consistently observed in the past.

### iii.   Bathroom Facilities

More significantly, the evidentiary record establishes that plaintiffs have historically been denied access on the same basis as non-disabled detainees to bathroom facilities at the six

courthouses.  As discussed in detail above, none of the holding cell bathroom facilities in any of the six courthouses (with the exception of two upper-level holding cells at the Maywood courthouse) were ADA complaint at the time this lawsuit was filed in August 2014.  To overcome structural barriers in accessing the toilet facilities, defendants began providing wheelchair-using detainees with portable commode chairs in the Spring of 2014.  However, the record is devoid of any evidence that the commode chairs actually assisted wheelchair-using detainees use the restroom facilities, let alone solved accessibility problems with the holding cell sinks that were located behind the toilets.

ADA Coordinator Fuentes testified that the commode chairs are not considered ADA-compliant, and despite the fact that the manufacturer of the chairs specifically instructs that the chairs be used with assistance, no such assistance was provided.  Plaintiffs' witnesses consistently and credibly testified to being unable to use the toilet facilities or being able to do so only with great difficulty, even when provided with a commode chair.  As such, the portable commode chairs were not a reasonable accommodation to overcome the structural barriers faced by wheelchair-using detainees trying to access bathroom facilities in the courthouse holding cells.  Because the commode chairs were not a reasonable accommodation, defendants' policy and practice of bringing wheelchair-using detainees to and from their court appearances directly from the lower-level holding cells was also not a reasonable accommodation to overcome the lack of accessible bathroom facilities in the upper-level courthouse holding cells.

Even assuming *arguendo* that the commode chairs were a reasonable accommodation, they were not supplied to the Leighton courthouse until early 2014 and to the suburban courthouses until mid-2014.  Accordingly, wheelchair-using detainees were without this

accommodation prior to those periods. Likewise, defendants' policy and practice of bringing wheelchair-using detainees to a public accessible restroom was not implemented (if at all) until April of 2014. Given that defendants did not consistently assist wheelchair-using detainees up and down courthouse ramps or provide a reasonable accommodation to allow wheelchair-using detainees to use holding cell bathroom facilities on the same basis as non-disabled detainees, the court finds that defendants have, in the past, violated plaintiffs' rights pursuant to the ADA.

Although the court has found *past* ADA violations, plaintiffs are not entitled to the declaratory judgment they request, that "detainees *are* being denied rights secured by the ADA and the Rehabilitation Act when they are transported to and from the Jail and court appearances." (Emphasis added.) To begin with, contrary to the underlying purpose of such relief, the declaratory judgment plaintiffs request would do nothing to protect the plaintiffs "with regard to some future acts," Global Parking Sys. of Indiana, Inc. v. Parking Solutions, Inc., No. 13-CV-00284, 2015 WL 1186787 (S.D. Ind. March 16, 2015), nor would it help define the parties' rights going forward. Moreover, in light of the injunctive relief plaintiffs seek, a declaratory judgment would not serve a "useful purpose." See Cohn v. Guaranteed Rate Inc., No. 14-C-9369, 2015 WL 5307625, at *5 (N.D. Ill. Sept. 10, 2015) (declining to exercise its jurisdiction over plaintiff's claim for declaratory judgment, because it was duplicative of plaintiff's other claims). Finally, contrary to evidencing present ADA violations, the record establishes that defendants have undertaken extensive construction, beyond what is required of them by the ADA or the Rehab Act, that has remedied the majority of the violations about which plaintiffs complain.

**D.     Injunctive Relief**

According to plaintiffs, "[t]he record in this case shows the need for" a permanent injunction, "requiring the Sheriff to change Order 11.14.35.0 to require: Employees of the Sheriff *shall* push each detainee who is using a wheelchair up and down ramps in all courthouses." (Emphasis included).  On June 10, 2010, the court held that it would rule on plaintiffs' motion for a preliminary injunction only, despite the fact that it had previously combined the evidentiary hearing with a trial on the merits.  However, in light of plaintiffs' most recent request for a permanent injunction, and the fact that the evidentiary record has continued to grow since this issue was last addressed, preliminary injunctive relief is no longer before the court.  Accordingly, the court now considers plaintiffs' request for a permanent injunction.

As discussed above, on March 13, 2015, the Sheriff issued a general order effective March 27, 2015, stating that "When practicable, [Sheriff's officers] shall provide assistance to wheelchair-bound subjects who are in CCSO custody," including "[p]ushing subjects up and down ramps in CCSO facilities."  Plaintiffs argue that "when practicable" does not ensure that wheelchair-using detainees will be given assistance up and down courthouse ramps.  Defendants, however, contend that the "when practicable" language is necessary because an emergency situation, such as instances requiring all available officers to respond to a security matter, may arise in which no officer is available to provide ramp assistance.  According to the Sheriff, "[t]hese circumstances rarely occur; yet the Sheriff should be allowed the latitude to craft policies and procedures to permit officers flexibility when they do."  The Sheriff, however, concedes that it "is not opposed to changing language within the Order."  Doc. no.  158.

A permanent injunction "requires a showing that: (1) the plaintiffs have suffered irreparable harm; (2) monetary damages are inadequate to remedy the injury; (3) an equitable remedy is warranted based on the balance of hardships between the plaintiffs and defendant; and (4) the public interest would be well served by the injunction." Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 892 (7th Cir. 2011). Given the court's ruling that defendants have discriminated against wheelchair-using detainees by failing to consistently push them up and down courthouse ramps, plaintiffs have succeed on the merits of their ADA claim with respect to this alleged statutory violation. Notwithstanding this finding, the ramps at some or all of the six courthouses remain non-compliant with current ADA standards and plaintiffs have established that defendants' current policy and practice of helping detainees maneuver the ramps continues to be applied sporadically, despite the Sheriff's order. As such, the court's finding does not rectified plaintiffs' injuries. See Walgreen Co. v. Sara Creek Prop. Co., B.V., 966 F.2d 273, 275 (7th Cir. 1992) ("'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment."). Although plaintiffs seek to recover damages pursuant to Title II, these damages are not an adequate remedy because they are meant to compensate plaintiffs for past instances of discrimination, but, if rewarded, will do nothing to protect plaintiffs' rights going forward.

Where, as here, the plaintiff requests a mandatory injunction requiring defendants to perform an affirmative act, the balance of harms inquiry is particularly important as a part of the court's evaluation of whether injunctive relief is appropriate. See Kartman, 634 F.3d at 892. Defendants adamantly assert that they already provide the relief requested and have expressed their willingness to revise the Sheriff's order to ensure that all wheelchair-using detainees

receive the required assistance.  As such, there is no significant harm imposed by requiring

defendants to alter the order at issue.  Conversely, without injunctive relief, plaintiffs' rights

under the ADA and Rehab Act will likely continue to be violated.  Because the balance of harms

favors plaintiffs and an injunction protecting their federal rights is in the public interest,

plaintiffs have established their right to permanent injunctive relief.

Although plaintiffs are entitled to permanent injunctive relief, their proposed

amendments to the Sheriff's order do not adequately take into account the corrections context

under which the order will be imposed.  As discussed above, defendants have expressed a

legitimate concern that plaintiffs' proposed order, requiring an officer to push wheelchair-using

detainees up and down the ramps no matter the circumstances, may cause safety and security

issues in the event of an emergency.  However, as the evidence has established, the Sheriff's

order is presently too broad and indefinite to protect plaintiffs' federal rights under the ADA.

For example, an officer may not find it "practicable" to push a wheelchair-using detainee up a

courthouse ramp when carrying something in his hands.  Accordingly, cognizant of defendants'

concerns and the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a),[8] which requires

injunctive relief to be narrowly drawn in the corrections setting, defendants should be given an

opportunity to propose an amended Sheriff's order that more specifically addresses the

exceptional circumstances about which they are concerned.

---

[8]  Although the instant case predominantly involves conditions at the six respective courthouses and not "prison conditions," as specified by the PLRA, the parties appear to agree that the PLRA is applicable to any injunction this court may enter.  Because plaintiffs and class members are incarcerated during their time at the courthouses, the court agrees that the PLRA is applicable.

## CONCLUSION

For the foregoing reasons, it is hereby ordered:

1.      Plaintiffs' request for a declaratory judgment is denied;

2.      Plaintiffs' request for mandatory injunctive relief requiring defendants to alter Sheriff's Order 11.14.35.0 to state that: "Employees of the Sheriff *shall* push each detainee who is using a wheelchair up and down ramps in all courthouses," is denied, in light of paragraph 3 below;

3.      Defendant Sheriff is directed to amend the order referenced in paragraph 2 above with language ensuring that wheelchair-using detainees are consistently assisted when maneuvering courthouse ramps that are not compliant with the ADA, explaining clearly what exigent circumstances would excuse such assistance.  The Sheriff is directed to submit a proposed amended order on or before October 29, 2015;

4.      Defendants are ordered to submit a verified report on the status of the ADA-related construction at the six courthouses in question on or before October 29, 2015;

5.      Plaintiffs may respond to defendants' submissions on or before November 12, 2015;

6.      This matter is set for a hearing on the status of the matters discussed above on November 18, 2015, at 10:00 a.m.

**ENTER:**      **October 8, 2015**

**Robert W. Gettleman**
**United States District Judge**