# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

August 21, 2018

**F I L E D**

To:     Thomas G. Bruton
        UNITED STATES DISTRICT COURT
        Northern District of Illinois
        Chicago , IL 60604-0000

**AUG 2 2 2018** Kb

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  | JOHNATHAN LACY, et al.,<br>Plaintiffs - Appellees |
| --- | --- |
| No. 17-2141 | v.<br><br>COOK COUNTY, ILLINOIS and THOMAS J. DART,<br>Defendants - Appellants |

| **Originating Case Information:** |
| --- |
| District Court No: 1:14-cv-06259<br>Northern District of Illinois, Eastern Division<br>District Judge Robert W. Gettleman |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A
certified copy of the opinion/order of the court and judgment, if any, and any direction as to
costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          Entire record returned consisting of

Pleadings:                        7 vol. of loose pleadings

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

-------------------------------------

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**

8/22/18

**Received by:**

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2141

JOHNATHAN LACY, et al.,

*Plaintiffs-Appellees,*

*v.*

COOK COUNTY, ILLINOIS and THOMAS
J. DART,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-06259 — **Robert W. Gettleman,** *Judge.*

ARGUED APRIL 19, 2018 — DECIDED JULY 30, 2018

Before RIPPLE, MANION, and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Five wheelchair-using detainees
brought this lawsuit against Cook County, Illinois, and the
Sheriff, alleging violations of the Americans with Disabilities
Act ("ADA") and the Rehabilitation Act ("RHA"). Their
claims are based on purportedly inaccessible ramps and bath-
room facilities at six county courthouses. The district court
certified a class for purposes of injunctive relief, and the

named plaintiffs also sought damages individually for the same alleged violations.

The district court held an evidentiary hearing on the equitable claims first. The parties then filed cross motions for summary judgment on their individual damage claims. The court entered a permanent injunction based on its factual findings and legal conclusion that the defendants had violated the ADA. Then, relying largely on these findings, the court granted partial summary judgment to the plaintiffs on liability in their personal damage actions. The court then submitted the question of individual damage awards to a jury. Meanwhile, it granted a supplemental permanent injunction to the class.

We hold that the district court improperly relied on its own findings of fact when it granted partial summary judgment to the plaintiffs on their damage claims. When equitable and legal claims are joined in a single suit, common questions of fact should be tried first to a jury absent extraordinary circumstances or an unequivocal waiver by all parties of their jury trial rights. The record before us does not reflect any such waiver by the defendants. We therefore vacate the grant of partial summary judgment and remand for a jury trial on the question of liability. As a result, we also vacate the court's grant of permanent injunctive relief and vacate the jury's determinations of damage awards. We leave undisturbed the district court's decisions to certify the class and to grant supplemental injunctive relief to the class. This latter injunction is not related to the questions that should have been submitted to the jury. Accordingly, we affirm in part, vacate in part, and remand for further proceedings.

I

## BACKGROUND

### A.

In 1990, Congress enacted the ADA to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). This sweeping legislation was animated by the finding that "individuals with disabilities continually encounter various forms of discrimination," ranging from "outright intentional exclusion" to "the discriminatory effects of architectural, transportation, and communication barriers." *Id.* § 12101(a)(5). The ADA was crafted "to advance equal-citizenship stature for persons with disabilities," *Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring), and to remedy their status as "a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society," *id.* at 516 (majority opinion) (quoting 42 U.S.C. § 12101(a)(7)).

The ADA is organized into three titles prohibiting discrimination across three major spheres of public life: employment (Title I); public services, programs, and activities (Title II); and public accommodations (Title III). This case arises from the protections of Title II.[1] The primary mandate of Title II is that "no qualified individual with a disability shall, by

---

[1] The plaintiffs also filed suit under section 504 of the Rehabilitation Act. Because Title II was modeled after section 504, "the elements of claims under the two provisions are nearly identical." *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999). Therefore, absent circumstances not present here, we apply precedent under one statute to cases involving the other. *See id.*

reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This broad directive has been developed further by the Department of Justice through implementing regulations, accessibility standards, and administrative guidance. *See id.* § 12134(a) (instructing Attorney General to promulgate regulations implementing pertinent part of Title II).[2]

To prove a *prima facie* case of discrimination under Title II, a plaintiff must show: (1) "that he is a 'qualified individual with a disability'"; (2) "that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity"; and (3) "that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). It is well established that a failure to make "reasonable modifications in policies, practices, or procedures" can constitute discrimination under Title II. 28 C.F.R. § 35.130(b)(7)(i)[3]; *see also A.H. by Holzmueller*

---

[2] The Supreme Court has not specified whether the DOJ's Title II regulations warrant deference under *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999). The Court has said, however, that the DOJ's views "warrant respect" given that Congress directed the agency to implement Title II. *Id.*

[3] Section 35.130(b)(7) states, in relevant part, that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

*v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

The obligation to make "reasonable modifications" parallels the obligations to make "reasonable accommodations" in the context of Titles I and III. *See A.H.*, 881 F.3d at 592 (recognizing corresponding language in Title II regulations and Title III). These requirements derive from the understanding that certain practices can discriminate against individuals with disabilities even when those practices are facially neutral and consistently applied. *See Lane*, 541 U.S. at 536 (Ginsburg, J., concurring) ("Congress understood in shaping the ADA [that addressing discrimination] would sometimes require not blindfolded equality, but responsiveness to difference; not indifference, but accommodation.").

Perhaps the most obvious example of such discrimination is when structural barriers prevent people with disabilities from accessing otherwise available public services. To remedy this form of discrimination, the DOJ has adopted structural accessibility standards that apply to newly constructed or altered facilities subject to Titles II and III. *See* 28 C.F.R. § 35.151(c).[4] Of course, structural renovations can be prohibitively costly for some public entities, so the regulations provide flexible compliance options for facilities built before 1992 and unaltered since: compliance can be achieved "through

---

[4] The 2010 ADA Standards for Accessible Design, which we refer to as the "accessibility standards," consist of the Title II regulations at 28 C.F.R. § 35.151 and the 2004 ADA Accessibility Guidelines ("ADAAG") at 36 C.F.R. part 1191, appendices B and D.

such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, ... alteration of existing facilities ... or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." *Id.* § 35.150(b)(1). "And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service." *Lane*, 541 U.S. at 532 (citing 28 C.F.R. §§ 35.150(a)(2), (a)(3)).

When public entities offer services at inaccessible facilities built before 1992, it is clear that they can comply with Title II by making reasonable modifications to their policies, practices, or procedures. It is often less clear, however, whether a given modification is reasonable. This distinction has generated a significant amount of litigation, to which we add one more case today.

## B.

This case centers on the facilities of six courthouses in Cook County, Illinois. The plaintiffs are five wheelchair-using detainees: Johnathan Lacy, Kenneth Farris, Marque Bowers, Maurice Boston, and Kevin Dawson. They each attended court approximately once per month in connection with their individual criminal cases. Their court appearances took place at the Leighton Criminal Courthouse in Chicago or at one of five suburban courthouses in Maywood, Markham, Skokie, Rolling Meadows, and Bridgeview. All of these courthouses were built before 1992 and thus are not subject to the ADA's

structural accessibility standards. *See Lane*, 541 U.S. at 532; 28 C.F.R. § 35.150(b)(1). Nonetheless, to the extent that the facilities prevent individuals with disabilities from meaningfully accessing public services, reasonable modifications are required. 42 U.S.C. §§ 35.130(b)(7)(i), 35.150(a).

The plaintiffs contend that Cook County and Thomas J. Dart, the Sheriff, failed to provide reasonable modifications with respect to two structural barriers at the courthouses: ramps and bathroom facilities.[5] In order to access the courthouses for their monthly appearances, the plaintiffs had to traverse steep entrance and exit ramps in their wheelchairs. Once inside, they waited in holding cells until their cases were called, which could take several hours. The holding cells contained bathroom facilities—typically a combination sink and toilet, set off by a translucent "privacy screen."

During the relevant time period, the ramps and bathroom facilities did not comply with the latest accessibility standards.[6] None of the parties disputes that the ramps did not meet the relevant sloping requirements and that the bathroom facilities did not include grab bars or sufficient clear-floor space under the 2010 standards. Rather, the parties dispute whether the defendants' policies and practices provided reasonable modifications to overcome these physical barriers.

---

[5] Initially, the plaintiffs also alleged ADA violations based on their transportation to the courthouses. The district court declined to grant injunctive relief on that claim, and the plaintiffs have not appealed its ruling. We thus limit our discussion to the ramps and bathroom facilities.

[6] Two holding cells at the Maywood courthouse had been renovated to comply with the accessibility standards. The plaintiffs' allegations do not implicate those two facilities.

The defendants maintain that they have complied with the ADA by enacting a policy of assisting wheelchair-using detainees with the ramps and by providing portable commode chairs in at least one holding cell per courthouse. They also submit that courthouse personnel were instructed to escort wheelchair-using detainees to public, ADA-compliant restrooms in the event of an emergency. According to the plaintiffs, however, they were not consistently assisted and often had to maneuver the ramps alone. They also insist that they could not use the commode chairs, or could do so only with great difficulty, and that they were not escorted to public, ADA-compliant restrooms as an alternative.

## C.

The plaintiffs filed this action in August 2014. They sought prospective injunctive relief as well as damages for past violations. At the start of the proceedings, the plaintiffs sought a preliminary injunction to prohibit the defendants from violating the ADA. Shortly thereafter, they sought certification of a class of all wheelchair-bound detainees presently confined at the Cook County Jail. As the parties were preparing for a hearing on preliminary injunctive relief, the plaintiffs moved to consolidate the hearing with a trial on their request for a permanent injunction under Federal Rule of Civil Procedure 65(a)(2). The court denied consolidation and began the hearing on December 17, 2014. The next day, however, it reversed its interlocutory decision and consolidated the hearing with a trial on the merits for purposes of injunctive relief.

The evidentiary hearing lasted seven days over a span of two full months. The plaintiffs presented testimony from

ADA experts and a number of wheelchair-using detainees, in-
cluding Mr. Dawson and Mr. Farris, who testified to the bar-
riers they faced when attending court. The hearing also fea-
tured testimony from court service officers and Sheriff's per-
sonnel, including the ADA compliance coordinator and ADA
project director, who testified to the ongoing renovation of the
County courthouses. The parties also submitted video footage
showing wheelchair-using detainees traversing the ramps
and using the holding cell bathrooms with disputed degrees
of difficulty. Throughout the proceedings, the parties fiercely
contested whether the Sheriff enforced the ramp-assistance
policy and whether the portable commode chairs adequately
accommodated the plaintiffs. Notably, although the district
court had ordered the consolidation of the preliminary injunc-
tion hearing with a trial on the merits, it referred throughout
the proceedings to a "preliminary injunction."[7]

After the close of the hearing but before it issued a deci-
sion, the court granted the plaintiffs' pending motion for class
certification and certified the class of "[a]ll Cook County Jail
detainees who have been assigned and currently use a wheel-
chair."[8] The plaintiffs immediately filed a motion on behalf of
the class seeking a permanent injunction with respect to the
ramp-assistance policy. The court denied this motion as
premature; although the hearing had ended, the court still
was reviewing evidence and conducting status hearings
about the defendants' ongoing courthouse renovations.

---

[7] *See* note 24 and text accompanying notes 25–28.

[8] R.142 at 15.

On June 10, 2015, the court again reversed its earlier ruling and stated that it would "not combine its consideration of the motion for [a] preliminary injunction with [a] ruling on the final merits of the case."[9] Nevertheless, in their final memorandum in support of injunctive relief, the plaintiffs urged the court to enter a final declaratory judgment as well as a permanent injunction requiring the Sheriff to revise the ramp-assistance policy to ensure its consistent enforcement.

Before the court issued a decision on injunctive relief, it collected summary judgment briefs from both sides on the plaintiffs' individual damage claims. The named plaintiffs filed a motion seeking partial summary judgment on the question of ADA liability, and the defendants filed a cross motion for complete summary judgment. Both sides submitted Local Rule 56.1 statements of material fact and responded in opposition to the other's summary judgment filings.

On October 8, 2015, before ruling on summary judgment, the court issued an opinion on injunctive relief. After acknowledging its most recent decision to rule on only the request for a *preliminary* injunction, the court changed course yet again. It explained that "in light of plaintiffs' most recent request for a permanent injunction, and the fact that the evidentiary record has continued to grow since this issue was last addressed, preliminary injunctive relief is no longer before the court."[10] Accordingly, the opinion addressed the merits of the plaintiffs' claims.

---

[9] R.159 at 1.

[10] R.203 at 27.

The court's opinion contained extensive findings of fact and conclusions of law. Based on "what it [found] to be most relevant" in the record, the court found that the defendants had not consistently helped wheelchair-using detainees maneuver the ramps.[11] It also found that the plaintiffs' "witnesses consistently and credibly [had] testified to being unable to use the toilet facilities or being able to do so only with great difficulty, even when provided with a commode chair."[12] The court further found that commode chairs were not provided, and the alternative policy of escorting detainees to public restrooms was not implemented, until mid-2014—after the plaintiffs' claims arose. Therefore, the court concluded that the "defendants have, in the past, violated plaintiffs' rights pursuant to the ADA."[13]

Based on these findings, the court granted the plaintiffs' request for a permanent injunction with respect to the ramp-assistance policy, but it denied their request for a declaratory judgment.[14] "Although the court has found *past*

---

[11] *Id.* at 7 n.5.

[12] *Id.* at 25.

[13] *Id.* at 26. While the court focused on the second element of a Title II violation—namely, whether the defendants failed to provide reasonable modifications to overcome noncompliant facilities—it also found that the first and third elements were satisfied. *See id.* at 22 (explaining that plaintiffs are otherwise qualified individuals with disabilities under the ADA).

[14] The court did not address injunctive relief with respect to the bathroom facilities; the plaintiffs' most recent filings did not request such relief.

ADA violations," it explained, "the defendants have undertaken extensive construction, beyond what is required of them by the ADA or the Rehab Act, that has remedied the majority of the violations about which plaintiffs complain."[15]

On November 19, 2015, the court granted partial summary judgment to the plaintiffs on the question of liability in their individual damage actions. The court acknowledged that "[o]rdinarily, the following facts would be undisputed and come from the parties' Local Rule 56.1 statements and responses."[16] However, because the court already had made factual findings in granting the injunction, it described the Rule 56.1 statements as largely "moot" and relied on its existing findings insofar as they informed the determination of summary judgment.[17] As the court explained, the "plaintiffs have already established that they were discriminated against in violation of the ADA."[18] Therefore, the only remaining element for them to prove in order to collect damages was the *intentional* nature of the defendants' discrimination. *See Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007) (rejecting ADA claim for damages where district court properly found no intentional discrimination); *Love*, 103 F.3d at 561 (acknowledging standard of intentional discrimination for compensatory damages under the RHA and implicitly applying same standard to ADA claim).

---

[15] *Id.* at 26.

[16] R.218 at 2 n.2.

[17] *Id.* at 4.

[18] *Id.* at 6.

The district court recognized that we have not yet spoken on the proper standard for establishing intentional discrimination. *See Strominger v. Brock*, 592 F. App'x 508, 511–12 (7th Cir. 2014) (acknowledging our silence on the matter). Absent guidance from our court, the district court adopted the deliberate indifference standard advocated by the parties and employed by a majority of other courts of appeals.[19] This standard requires proof of (1) "knowledge that a harm to a federally protected right is substantially likely" and (2) "a failure to act upon that likelihood." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

The court held that there was "no genuine issue of material fact as to defendants' knowledge of likely ADA violations and their failure to act in light of that knowledge."[20] The court observed that the County previously had undertaken significant ADA-related construction at the courthouses but had limited its renovations to the public-facing portions of the buildings. It also noted the defendants' involvement in past litigation involving very similar claims under the ADA. Based on this circumstantial evidence of the defendants' knowledge, the court did not think that a reasonable trier of fact could rule in the defendants' favor on the issue of deliberate indifference.

After granting the plaintiffs' motion for partial summary judgment on liability, the court proceeded with jury trials to

---

[19] *See* note 33 (comparing cases).

[20] R.218 at 7.

determine the amount of damages owed to each named plaintiff. A jury awarded Mr. Lacy $600 in damages and Mr. Boston and Mr. Bowers $0 in damages. Mr. Dawson and the defendants reached a private settlement. Mr. Farris and the defendants agreed to a judgment in Mr. Farris's favor for $0.

On January 7, 2016, the plaintiff class filed a motion for a supplemental permanent injunction to remedy the County's alleged failure to bring two holding cells at the Maywood courthouse into compliance with the ADA's clear-floor-space requirements. According to the plaintiffs, the County had made alterations to these holding cells, thereby triggering its obligation to bring the facilities into complete compliance with the latest accessibility standards. But, under the pertinent standards, the privacy screens in the holding cells were 1.5 inches too close to the rear walls. The County maintained that it was excused from strict compliance with the accessibility standards because it altered only certain elements within the holding cells and because moving the screens was technically infeasible. The court rejected the County's arguments and granted a permanent injunction ordering that the screens be moved, but it stayed its order pending this appeal.

## II

## DISCUSSION

The defendants now challenge four of the district court's orders: (1) the grant of partial summary judgment on liability in favor of the individual plaintiffs, (2) the jury verdict and $600 damage award in favor of Mr. Lacy, (3) the certification of the class, and (4) the grant of a permanent injunction regarding the Maywood privacy screens. For the reasons laid

out below, we vacate the district court's grant of partial summary judgment; vacate the jury's verdicts on damages; vacate the district court's injunction respecting the Sheriff's ramp policy; affirm the certification of the class; and affirm the class-wide injunction regarding the privacy screens. We address these issues in turn.

## A.

The defendants contend that the district court erred in granting summary judgment to the plaintiffs on the issue of ADA liability in their individual damage actions. They submit that, by relying on findings of fact from its prior decision to grant a permanent injunction, the court improperly weighed competing evidence and made credibility determinations and thereby usurped the role of the jury in the plaintiffs' damage claims. We agree.

In this action, the plaintiffs sought both equitable and legal relief to remedy the defendants' alleged ADA violations. They pursued the equitable claims on behalf of the class, seeking a prospective injunction against ongoing ADA violations. Simultaneously, the named plaintiffs brought damage actions on an individual basis, seeking monetary compensation for past ADA deprivations that they each claim to have suffered. These equitable and legal claims all required the factfinder to determine whether the defendants had violated the ADA by failing to provide reasonable modifications for wheelchair-using detainees with respect to the courthouse ramps and bathroom facilities.

It is well established that "when a legal claim is joined with an equitable claim, 'the right to jury trial on the legal

claim, including all issues common to both claims, remains intact.'" *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 354 (7th Cir. 1987) (quoting *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974)).[21] In order to protect parties' jury trial rights in these situations, courts typically submit the legal claims to a jury before the court decides the equitable claims. *See New West, L.P. v. City of Joliet*, 891 F.3d 271, 273 (7th Cir. 2018) ("Judges usually ought to put jury-trial issues ahead of bench-trial issues because that order is most respectful of constitutional interests ... ."). Otherwise, the court might limit the parties' opportunity to try to a jury every issue underlying the legal claims by affording preclusive effect to its own findings of fact on questions that are common to both the legal and equitable claims. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959). Although this order of proceedings is not constitutionally mandated, *see New West*, 891 F.3d at 273, the Supreme Court has instructed that "only under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims," *Beacon*, 359 U.S. at 510–11.[22]

---

[21] The plaintiffs specifically requested a trial by jury on their damage claims, R.9 (Amended Complaint) at 13, and the defendants were entitled to rely on this jury demand, *see Lamex Foods, Inc. v. Audeliz Lebrón Corp.*, 646 F.3d 100, 106 (1st Cir. 2011) ("Where one party has made a demand, others are entitled to rely on the demand with respect to issues covered by the demand and need not make an independent demand of their own." (quoting *In re N-500L Cases*, 691 F.2d 15, 22 (1st Cir. 1982))).

[22] We recognize that issue preclusion can be applied properly to foreclose the relitigation of issues underlying a legal claim when those issues already have been decided conclusively in a prior equitable lawsuit. *See*

In this case, the order of proceedings was complicated further by the plaintiffs' request to consolidate the hearing on preliminary injunctive relief with a trial on the merits for permanent injunctive relief. Consolidation is procedurally significant, because in granting or denying a *preliminary* injunction, the court would decide only the plaintiffs' *likelihood of success on the merits*, whereas in granting or denying a *permanent* injunction, it would decide their *actual success on the merits*. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). In other words, only a hearing on *permanent* injunctive relief would result in conclusive findings as to the defendants' actual liability under the ADA; any judicial findings made in deciding *preliminary* relief would remain subject to change. *See id.* ("[F]indings made at the preliminary injunction stage do not bind the district court as the case progresses.").

---

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 333–35 (1979); *Crowder v. Lash*, 687 F.2d 996, 1009–10 (7th Cir. 1982). However, this rule does not control in the present circumstances where the legal and equitable claims sharing common issues are joined in a single lawsuit. *See Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550–51, 553–54 (1990) (distinguishing *Beacon Theatres* from *Parklane* on ground that *Beacon* involved legal and equitable claims joined in the same action whereas *Parklane* involved two lawsuits, the prior of which already had been affirmed on appeal); *New West, L.P. v. City of Joliet*, 891 F.3d 271, 273 (7th Cir. 2018) (making similar observation); *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471–72 (7th Cir. 2004) (noting that if a class is certified for purposes of injunctive relief and class members also seek damages individually as part of the same lawsuit, "a jury will resolve common factual disputes, and its resolution will control when the judge takes up the request for an injunction").

Under Federal Rule of Civil Procedure 65(a)(2), the district court was authorized to consolidate the hearing on preliminary injunctive relief with a trial on the merits; however, in so doing, the court was obligated to "preserve any party's right to a jury trial." Fed. R. Civ. P. 65(a)(2).[23] In some cases, the parties might waive their jury trial rights by consenting to consolidation and participating in the hearing on permanent injunctive relief *before* trying any overlapping legal claims to a jury. On the other hand, if all of the parties do not waive their jury trial rights, "the proper procedure would be for the district court to hold a hearing on the preliminary injunction, then to try the legal issues before a jury, and then to hold the hearing itself on the permanent injunction." *Southland Reship, Inc. v. Flegel*, 534 F.2d 639, 644 (5th Cir. 1976).

Here, throughout the hearing, the district court sent extremely mixed messages about the nature of the hearing itself. The record reveals that none of the participants understood exactly what the court was deciding—preliminary or permanent injunctive relief. Prior to the start of the hearing, the court denied the plaintiffs' request for consolidation. Then, during and after the hearing, the court reversed this decision three separate times. Moreover, even at the time when the

---

[23] Rule 65(a)(2) reads in full: "Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial." Fed. R. Civ. P. 65(a)(2).

court had consolidated the hearing as a formal matter, it continually referred to a "preliminary injunction" as the remedy at stake.[24] It also said that "[t]his isn't a final trial,"[25] that it was "not making any substantive rulings,"[26] and that the proper relief was "a moving target."[27] When the defendants sought clarification and reminded the court of its latest consolidation ruling, the judge responded that "I don't think it's a total trial on the merits, because these folks do have individual damage claims."[28] These ambiguous statements introduced significant confusion as to whether the court was considering preliminary or permanent relief and, consequently, whether it would make any conclusive findings about the alleged ADA violations.

After the close of the hearing, the court continued to send conflicting messages. On June 10, 2015, the court reversed its earlier order and ruled that it would not "combine its consideration of the motion for preliminary injunction with ruling

---

[24] *See, e.g.*, R.132 at 184–85 ("[R]emember, we're talking about a preliminary injunction here."); *id.* at 187 ("This is a preliminary injunction, and I did say that we were going to combine it into—to ultimate relief. But from what I'm hearing is, this is sort of a moving target … ."); R.134 at 131 (referencing "the issues that are before me in the preliminary injunction"); *id.* at 132 (noting that the class certification motion had been "put off until we can get through this preliminary injunction stage").

[25] R.132 at 185.

[26] R.130 at 32.

[27] *Id.* at 14; R.132 at 187; R.134 at 135.

[28] R.134 at 131–32.

on the final merits."[29] Then, before issuing its decision on injunctive relief, the court collected summary judgment briefs on the plaintiffs' individual damage claims. If anything, this order of proceedings suggested that the court's decision on the equitable claims would *not* incorporate conclusive findings that would affect the resolution of the legal claims. Indeed, the parties appear to have understood as much, for they submitted Local Rule 56.1 statements of material fact in conjunction with their respective summary judgment briefs. Yet, when the district court finally ruled, it granted a permanent injunction.

In these confusing circumstances, the defendants certainly did not waive their right to a jury trial by participating in the consolidated hearing. It is true that a party can waive its jury trial rights by participating in and failing to object to a non-jury fact-finding proceeding.[30] However, "there is a presumption against waiver of the constitutional right to jury trial," *Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1083 (7th Cir. 2001), and we will not infer waiver absent "clear, unequivocal evidence that the party intended to waive its right," *Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, 1306 (7th Cir. 1993). Indeed, we have made it clear that we will not infer waiver from a party's participation in non-jury proceedings unless "it was clear that the court intended to make fact determinations." *Fillmore v. Page*, 358 F.3d 496,

---

[29] R.159 at 1.

[30] *See Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004); *Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1083 (7th Cir. 2001) ("[T]his court has not required strict compliance with Rules 38 and 39 to effect a waiver of a jury demand.").

503 (7th Cir. 2004) (quoting *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir. 1987)).

Based on the record before us, we have no doubt that the district court failed to communicate its intent to make conclusive factual determinations in the hearing on injunctive relief. Given these particular circumstances, the defendants' participation in and failure to object to the hearing cannot be understood as "clear, unequivocal evidence" of waiver. *Reboy*, 9 F.3d at 1306. Absent such a waiver, the court should have held a hearing on the preliminary injunction, then tried the legal issues to a jury, and then held a hearing on the permanent injunction. *See Southland*, 534 F.2d at 644. Instead, by granting a permanent injunction without clear notice of consolidation, and then affording preclusive effect to its own findings of fact on central disputed questions, the court deprived the defendants of their right to a jury trial on ADA liability. This is reversible error. *See Lamex Foods, Inc. v. Audeliz Lebrón Corp.*, 646 F.3d 100, 107 (1st Cir. 2011) ("[O]rdering consolidation during the course of a preliminary injunction hearing is reversible error when little or no notice is given of this change and the effect is to deprive a party of the right to present his case on the merits." (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2950 (2d ed. 1995))).[31] We therefore vacate the district court's grant of partial summary judgment and remand for a jury trial on the question of ADA liability.

---

[31] We note that the plaintiffs have not argued, nor could they reasonably do so, that this case presents the kind of "imperative circumstances" that might warrant an extraordinary order of proceedings. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 511 (1959).

**B.**

The district court's error in relying on its own factual findings with respect to the damage claims has several important ramifications. We address them now.

First, it follows from our decision above that we must vacate the jury's verdicts on the question of damages. Accordingly, the jury's verdicts respecting Mr. Lacy, Mr. Boston, and Mr. Bowers are vacated for further proceedings. Mr. Dawson entered into a monetary settlement with the defendants, and Mr. Farris consented to a judgment of $0 in damages. It is unclear from the record, however, whether either of these agreements was conditioned on the defendants' right to challenge the underlying proceedings or whether the defendants waived their rights to review as to those two plaintiffs. *See McMillian v. Sheraton Chi. Hotel & Towers*, 567 F.3d 839, 843–44 (7th Cir. 2009) (noting that consensual nature of a judgment does not affect appellate jurisdiction but may affect the consenting party's right to review); *Hudson v. Chi. Teachers Union, Local No. 1*, 922 F.2d 1306, 1312–13 (7th Cir. 1991) (emphasizing the importance of "practicalities" and explaining that, although settlements generally are not appealable, a stipulated judgment may not foreclose appellate review if the stipulation extends only to the matter of damages). We thus leave it

to the district court, which is far more familiar with the record, to determine whether it is proper to include Mr. Farris and Mr. Dawson in the jury trial on remand.[32]

Second, we must address the effect of our holding on the district court's grant of permanent injunctive relief with respect to the Sheriff's ramp policy. Had the district court followed the instruction in *Beacon* and submitted the common questions of fact to a jury before rendering its own decision on the permanent injunction, the court would have been bound by the jury's factual determinations. *See Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471–72 (7th Cir. 2004); *Hussein*, 816 F.2d at 355. Therefore, if not for the court's error, the defendants would have been entitled to a jury determination on all of the facts underlying the alleged ADA violations. Because "most if not all of [the] elements [of the damage claims were] presented to the wrong trier of fact," the court's error "infect[ed] the disposition" of the equitable claims as well. *Bouchet v. Nat'l Urban League, Inc.*, 730 F.2d 799, 803 (D.C. Cir. 1984).

In these circumstances, "relitigation is the only mechanism that can completely correct the error of the court below." *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 553 (1990). This approach comports with the practice of the Supreme Court in related cases. *See id.* at 552–53 (listing cases where Court has "reversed and remanded each case in its entirety for a trial before a jury" where petitioners were wrongfully denied their

---

[32] *Cf. Sosna v. Iowa*, 419 U.S. 393, 402 n.12 (1975) ("When this Court has entertained doubt about the continuing nature of a case or controversy, it has remanded the case to the lower court for consideration of the possibility of mootness.").

right to a jury trial on legal issues). Moreover, it protects "the integrity of the judicial process" by avoiding "the possibility of inconsistent determinations of the same question." *Heyman v. Kline*, 456 F.2d 123, 131 (2d Cir. 1972). In order to vindicate fully the defendants' jury trial rights, we hereby vacate the district court's October 8, 2015, judgment on the merits of the plaintiffs' first equitable claim. After a jury decides the common questions of fact, the court will be "prohibited from reconsidering any issues necessarily and actually decided by the jury." *Hussein*, 816 F.2d at 355.

## C.

We now address those matters raised on appeal that are not tainted directly by the deprivation of a jury trial.

### 1.

The district court, noting that the matter was undecided in this court, determined that damages could be awarded for the ADA violations upon a showing of deliberate indifference on the part of the defendants. On remand, a jury will have to determine in the first instance whether the defendants have violated the ADA with respect to each named plaintiff. If it finds a violation, the same jury will have to decide whether any ADA violations were the result of intentional discrimination. *See Love*, 103 F.3d at 561 (upholding award of damages in ADA case where jury found intentional discrimination). As the district court recognized, many courts of appeals have spoken on the standard for establishing intentional discrimi-

nation, although we have yet to decide the issue. *See Strom-
inger*, 592 F. App'x at 511–12. Considerations of judicial econ-
omy counsel that we decide it today.

As this question has percolated through the courts, our sis-
ter circuits have considered two standards for intentional dis-
crimination: deliberate indifference and discriminatory ani-
mus. *See S.H.*, 729 F.3d at 262–63 (laying out both standards
and adopting the former); *Liese v. Indian River Cty. Hosp. Dist.*,
701 F.3d 334, 344–45 (11th Cir. 2012) (same); *Duvall v. Cty. of
Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001) (same). Deliber-
ate indifference occurs when "the defendant *knew* that harm
to a federally protected right was substantially likely and …
*failed* to act on that likelihood." *Liese*, 701 F.3d at 344 (altera-
tion and emphases in original) (quoting *T.W. ex rel. Wilson v.
Sch. Bd. of Seminole Cty.*, 610 F.3d 588, 604 (11th Cir. 2010)). It
is meant to identify indifference that is a "deliberate choice."
*Id.* (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268,
276 (2d Cir. 2009)). "Discriminatory animus, by contrast, re-
quires a showing of prejudice, spite, or ill will," and is "gen-
erally thought to be a combination of intentionally differential
treatment and a disdainful motive for acting that way." *Id.*

Although some courts of appeals appear to have applied
heightened standards in certain contexts, most of our sister
circuits have adopted deliberate indifference as the proper
standard for obtaining compensatory damages under Title II
and section 504.[33] In this case, the district court required a

---

[33] *Compare S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263
(3d Cir. 2013) (adopting deliberate indifference standard for intentional
discrimination); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344–45

showing of deliberate indifference, and the parties do not dispute that approach on appeal. We now agree with the majority of courts that have spoken on the question and hold that a plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference. Specifically, we adopt the two-part standard applied by most other courts, "requiring both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *S.H.*, 729 F.3d at 263 (quoting *Duvall*, 260 F.3d at 1139).

This standard is sensible based on the clear purpose and evolution of the ADA. Title II was modeled after section 504, which was meant to combat discrimination that is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). One commentator interpreted the ADA's statutory findings in light of its legislative history and concluded that, "[e]ven absent animus-based prejudice, people with disabilities may be deprived of opportunities"

---

(11th Cir. 2012) (same); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (same); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–76 (2d Cir. 2009) (same); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (same); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (same), *with Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 126–27 (1st Cir. 2003) (stating that compensatory damages are not available under Title II and section 504 absent "evidence of economic harm or animus toward the disabled," but not deciding whether such damages may be available in other circumstances); *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 575 (5th Cir. 2002) (stating that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA," but not adopting definitively an alternative standard for proving intentional discrimination).

which the ADA aims to protect. Samuel R. Bagenstos, *Subordination, Stigma, and "Disability"*, 86 Va. L. Rev. 397, 423 (2000); *see also* 42 U.S.C. § 12101(a)(7) (statutory finding that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity [and] full participation ... ."). Moreover, the "reasonable modification" requirement at the heart of this case clearly indicates the intent to combat exclusion that "is literally built into our physical and social environment," Bagenstos, *Subordination, supra*, at 425, even if it is not motivated by spite or ill will. Given this statutory framework, we agree with the Third Circuit that "the deliberate indifference standard is better suited to the remedial goals of the ... ADA than is the discriminatory animus alternative." *S.H.*, 729 F.3d at 264.

## 2.

The defendants next challenge the district court's certification of the class of "[a]ll Cook County Jail detainees who have been assigned and currently use a wheelchair."[34] We review class certification under an abuse of discretion standard. *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 549 (7th Cir. 2016). An abuse of discretion "can occur when a district court commits legal error or makes clearly erroneous factual findings." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). "Our review is deferential, but exacting: 'A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites' for class certification have been met." *Id.* (quoting *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637

---

[34] R.142 at 15.

F.3d 721, 723 (7th Cir. 2011)). The burden rests on the party seeking certification to show by a preponderance of the evidence that certification is proper. *Id.*

The prerequisites for certification are twofold. First, the plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 23(a). There are four prongs to this analysis:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
>
> (2) there are questions of law or fact common to the class (commonality);
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
>
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

*Id.* (quoting Fed. R. Civ. P. 23(a)). Second, the plaintiffs must demonstrate that one of the conditions of Rule 23(b) is met. Here, the plaintiffs sought certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Lastly, we have required that a class be "sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012).

The defendants first contend that the class is not ascertainable because "it encompassed anyone who could possibly require assistance of a wheelchair, regardless of if they suffered

any deprivation under the ADA."[35] This argument evokes our case law about classes that are defined too broadly to permit certification. We have said that a class should not be certified if "it sweeps within it persons who could not have been injured by the defendant's conduct ... [or] if it is apparent that it contains a great many persons who have suffered no injury." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). We have acknowledged simultaneously, however, that "a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable," given that a class can be certified yet fail to prove its case on the merits. *Id.*

There is no precise tipping point at which a class includes too many people who have not been harmed. "Such determinations are a matter of degree, and will turn on the facts as they appear from case to case." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Here, we are confident that the balance tips in favor of certification. According to the Department of Corrections, which keeps records of detainees who are assigned wheelchairs, there were approximately sixty detainees who qualified for the class at the time of certification.[36] The defendants have not suggested how many of these individuals could not have been injured

---

[35] Appellants' Br. 37.

[36] The fact that the Department of Corrections keeps records of all wheelchair-assigned detainees also undermines the defendants' argument that members of the class "cannot be determined through 'clear objective criteria' [and] will require 'complex, highly individualized' determinations." *Id.* (quoting *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 496 (7th Cir. 2012)). These records provide an extremely clear and objective criterion for ascertaining the class.

under the ADA, let alone shown "a great many" who evaded harm. *Kohen*, 571 F.3d at 677. To the contrary, considering the regularity of detainees' courthouse visits and the structural noncompliance of the facilities at all six courthouses, the class definition is well tailored to reach those individuals who would have suffered the deprivations alleged here.

Next, the defendants attack the commonality of the class. They submit that the reasonableness of a given accommodation will vary for each class member, making it impossible for the litigation to generate common answers.[37] To satisfy commonality, the plaintiffs must do more than show that they "suffered a violation of the same provision of law." *Jamie S.*, 668 F.3d at 497 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). Instead, they must assert a common injury that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

---

[37] The defendants also suggest that commonality is undermined by the plaintiffs' need to prove on an individual basis whether each class member is actually disabled under the ADA. The ADA defines disability, in relevant part, as a "physical or mental impairment that substantially limits one or more of the major life activities." 28 C.F.R. § 35.108(a)(1)(i). Although the "determination of whether an impairment substantially limits a major life activity requires an individualized assessment," *id.* § 35.108(d)(1)(vi), some "types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity," *id.* § 35.108(d)(2)(ii). This includes "mobility impairments requiring the use of a wheelchair." *Id.* § 35.108(d)(2)(iii)(D). Given that the assessment of these plaintiffs' impairments "should be particularly simple and straightforward," *id.* § 35.108(d)(2)(ii), the individualized nature of their disabilities does not undermine commonality here.

In other words, the key to commonality is "not the raising of common 'questions' ... but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original). "The critical point is 'the need for *conduct* common to members of the class.'" *Phillips*, 828 F.3d at 553 (emphasis in original) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

Although it is true that the reasonableness of a given accommodation will vary among individuals with differing disabilities, any dissimilarities among the proposed class members will not impede the generation of common answers in this case. We have acknowledged that "[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *A.H.*, 881 F.3d at 594 (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). The fact-specific nature of this inquiry may preclude class certification in some cases, for instance if the plaintiffs here had alleged a variety of disabilities or had sought a variety of accommodations based on their differing abilities. *See, e.g., Phillips*, 828 F.3d at 555 (finding lack of commonality where purported class members "each present a different situation that involved a different type of dental pain, took place at a different time, involved different medical professionals and prison staff, and concerned a different alleged deficiency in the treatment process").

Here, however, commonality abounds. The plaintiffs share a common physical impairment, as they are all confined to wheelchairs when attending court. Furthermore, they face common physical barriers when they confront steep ramps

and noncompliant bathroom facilities. And finally, they seek common modifications in the form of mandatory policies for assistance in pushing them up and down the ramps and escorting them to ADA-compliant restrooms. This is not a situation where "the defendant's allegedly injurious conduct differs from plaintiff to plaintiff," *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); rather, they all complain about the same failure to implement and enforce policies that would accommodate all wheelchair-using detainees.[38]

The defendants' challenge to the typicality requirement fails for largely the same reasons. *Cf. Wal-Mart*, 564 U.S. at 349

---

[38] This commonality of the plaintiffs' alleged injuries distinguishes this case from *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352, 359 (2011) (finding lack of commonality where "respondents wish to sue about literally millions of employment decisions at once" without identifying "a common mode of exercising discretion" in making such decisions), and *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497–98 (7th Cir. 2012) (finding lack of commonality where class members alleged IDEA violations ranging from school district's failure to identify eligible students, to its failure to timely refer them for evaluation and its failure to hold properly constituted meetings regarding their individualized education programs).

We note that many courts have certified classes based on allegedly unreasonable accommodations. *See, e.g., Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017) (upholding class certification against commonality challenge where disabled prisoners with heat sensitivities alleged failure to provide reasonable accommodations regarding regulation of temperatures in prison); *Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015) (finding commonality in Title II case where detainees alleged system-wide failure to accommodate deaf and hearing-impaired inmates); *Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Or. 2012) ("[I]n almost every case involving a challenge under Title II of the ADA and/or Section 504 of the Rehabilitation Act to discriminatory governmental policies and practices, courts have certified a class.").

n.4 (noting that the "commonality and typicality requirements ... tend to merge" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982))). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (quoting *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). This requirement "is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.'" *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quoting *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993)). Here, the named plaintiffs alleged the same injurious conduct and requested the same modifications as the class at-large. We see no reason to question the typicality of their claims.

Finally, the defendants ask us to decertify the class because Mr. Farris, Mr. Dawson, and Mr. Bowers supposedly are not credible and thus are not adequate representatives of the class. "A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). That is only the case, however, if the evidence is "so severely undermining [of his] credibility that a fact finder might reasonably focus on [his] credibility, to the detriment of the absent class members' claims." *Id.* at 728 (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)).

Although the district court harbored "serious doubts about plaintiff Farris' credibility," it concluded that

"[n]othing about plaintiff[s] Dawson, Bowers, and Farris' alleged credibility issues indicate that they have an antagonistic or conflicting claim, or that they do not have sufficient interest in the outcome of this case to ensure vigorous advocacy."[39] We do not think that this conclusion rested on clearly erroneous factual findings or legal error. *See Bell*, 800 F.3d at 373. Rather than turn a blind eye to the issue of credibility, the district court made a reasoned judgment that any weaknesses in the witnesses' integrity did not relate to a central element of the litigation, such as the defendants' compliance with the accessibility standards or the reasonableness of a mandatory ramp-assistance policy. Absent more compelling evidence that their credibility would detract from the adjudication of the class-wide claims, we will not decertify the class on this ground.[40]

---

[39] R.142 at 12.

[40] In their reply brief, the defendants submit that Mr. Lacy did not have standing to seek injunctive relief on behalf of the class because he was discharged into the custody of the Illinois Department of Corrections before the district court issued any decisions granting injunctive relief. Consequently, they claim, he is not an adequate representative of the class. Even if the defendants are correct and Mr. Lacy no longer had constitutional standing at that point, this conclusion does not undermine the certification of the class or the court's subsequent decisions regarding class-wide injunctive relief. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("The named plaintiff who no longer has a stake may not be a suitable class representative, but that is not a matter of jurisdiction and would not disqualify him from continuing as class representative until a more suitable member of the class was found to replace him." (quoting *Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008))). This rule makes good sense given the transient population that typically brings litigation on behalf of prisoners. Here, there was no shortage of suitable class members to replace Mr. Lacy.

Because the defendants have not undermined the ascertainableness of the class or the district court's findings of commonality, typicality, and adequacy of representation, we affirm the class's certification under Rule 23(b)(2).

3.

The defendants' final challenge relates to the district court's grant of a supplemental permanent injunction. After this litigation commenced, the County modified two holding cells at the Maywood courthouse to bring them into partial compliance with the latest accessibility standards. The County updated the holding cell entryways, replaced the metal benches, and installed new lavatory fixtures and grab bars; however, it did not remove or reposition the privacy screens.

The parties agree that under the latest accessibility standards, these privacy screens are 1.5 inches too close to the rear walls of the cells. They disagree, however, as to whether the accessibility standards require the County to remove or reposition the screens. After receiving supplemental briefing and conducting a limited evidentiary hearing, the district court concluded that the accessibility standards mandated the County's full compliance with the clear-floor-space requirements. It thus issued a permanent injunction requiring the County to move the privacy screens by 1.5 inches.

We review the court's grant of injunctive relief for an abuse of discretion; however, we review its factual determinations for clear error and its underlying legal conclusions de novo. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*

(*ADT II*), 724 F.3d 854, 863 (7th Cir. 2013). Permanent injunctive relief is appropriate when a plaintiff has shown: "(1) success ... on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist. (ADT I)*, 672 F.3d 492, 498 (7th Cir. 2012) (quoting *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003)). The defendants contest only the merits, so we limit our analysis accordingly.

Although the ADA does not require public entities to renovate facilities built before 1992, once a public entity alters such facilities, it is generally required to bring them into compliance with the latest accessibility standards. The implementing regulations codify this requirement as follows:

> Each facility or part of a facility altered ... in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities.

28 C.F.R. § 35.151(b)(1). Furthermore, if these alterations are commenced after March 15, 2012, they must comply with the latest accessibility standards: the 2010 ADA Standards for Accessible Design, which incorporate the 2004 ADA Accessibility Guidelines ("ADAAG"). *See id.* § 35.151(c)(3).

The County contends that its alterations to the Maywood holding cells did not trigger this complete compliance requirement for two reasons: (1) it did not intend to alter the

entire holding cells but only certain elements, and (2) it is technically infeasible to modify the privacy screens. The County relies on section 202.3 of the ADAAG, which states that "[w]here existing elements or spaces are altered, each altered element or space shall comply with the applicable requirements." 36 C.F.R. pt. 1191, app. B at 202.3. Section 202.3 continues to set out the so-called technical infeasibility exception: "In alterations, where compliance with applicable requirements is technically infeasible, the alteration shall comply with the requirements to the maximum extent feasible." *Id.* A "technically infeasible" alteration is defined, in relevant part, as "something that has little likelihood of being accomplished because existing structural conditions would require removing or altering a load-bearing member that is an essential part of the structural frame." *Id.* at 106.5.

We agree with the district court that these provisions do not exempt the County from its obligation to move the privacy screens. Whether the privacy screens are part of the altered elements or spaces, and thus must comply with the 2010 standards, depends on the intended scope of the alteration. The DOJ has explained the reach of section 202.3 in its commentary to the ADAAG:

> Under section 202.3 of the 2010 Standards[,] entities can alter as many elements within a room or space as they like without triggering a requirement to make the entire room or space accessible based on the alteration of individual elements. This does not, however, change the requirement that *if the intent was to alter the entire room or space*, the entire room or space must be

made accessible and comply with the applicable
requirements of … the 2010 Standards.

Dep't of Justice, *Guidance on the 2010 ADA Standards for Accessible Design* 74 (2010), www.ada.gov/regs2010/2010ADA-Standards/Guidance_2010ADAStandards_prt.pdf (emphasis added).

The district court concluded that the County intended to alter the holding cells in their entirety. It based this finding on the defendants' repeated representations that they planned to bring all of the holding cells into compliance with the latest standards. We see no clear error in this factual determination, especially given the circumstantial evidence that the County modified the privacy screens in all of the other renovated holding cells, in line with its supposed plan.

The County's second argument is equally unavailing. The County points to testimony by the Sheriff's ADA project director that the privacy screens are "embedded into the wall and the floor" and that removing the screens "will diminish the structural integrity of [the] wall."[41] In response, the plaintiffs highlight deposition testimony by the building contractor who prepared an estimate for moving the privacy screens. The contractor explained how the screens are "anchored in the concrete floor [and in] the structural glazed block wall" and that moving them would require saw cutting into both structures.[42] Nonetheless, when asked about the effect of such

---

[41] R.362 at 20, 31.

[42] R.364-2 at 38–40.

alterations on structural integrity, he said directly that both the wall and the floor would remain structurally sound.[43]

As the finder of fact on this matter, the district court was entitled to discredit the conclusory testimony of the ADA project director, especially when compared with the detailed testimony from the contractor. We see no clear error in the court's factual determination that moving the screens would not diminish the integrity of the structural frame. In so holding, we are not endorsing a strict liability standard for noncompliance with the ADAAG, as the County suggests. Rather, questions of technical infeasibility turn on detailed factual determinations about the effects of construction on the structural integrity of altered facilities. In this case, the district court reached a reasoned conclusion based on the competing evidence before it, and we see no reason to disturb its factual findings.[44]

The County has not shown any abuse of discretion by the district court in granting the supplemental permanent injunction. We therefore affirm its judgment on this matter.

## Conclusion

For the reasons expressed in this opinion, we vacate the grant of partial summary judgment and, consequently, vacate the jury's verdicts as to Mr. Lacy, Mr. Bowers, and Mr. Boston,

---

[43] *Id.* at 46.

[44] The County also advances an infeasibility argument based on "disproportionate" costs. Appellants' Br. 52. However, this disproportionality argument was not raised before the district court so we deem it waived on appeal. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

as well as the grant of permanent injunctive relief regarding the Sheriff's ramp policy. The effect of our holding on the settlement and judgment for Mr. Dawson and Mr. Farris, respectively, will depend on the district court's finding of waiver, or lack thereof, by the defendants of their right to appellate review as to those two plaintiffs.

In any event, we remand for a jury to decide whether the defendants violated the ADA for purposes of the relevant plaintiffs' damage actions, and, if so, whether any violations were the result of intentional discrimination. We affirm the certification of the class and the grant of permanent injunctive relief with respect to the Maywood privacy screens.

In sum, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. Each party shall bear its own costs for this appeal.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

July 30, 2018

Before:

KENNETH F. RIPPLE, Circuit Judge

DANIEL A. MANION, Circuit Judge

MICHAEL S. KANNE, Circuit Judge

| | |
|---|---|
| No. 17-2141 | JOHNATHAN LACY, et al., <br> Plaintiffs - Appellees <br><br> v. <br><br> COOK COUNTY, ILLINOIS and THOMAS J. DART, <br> Defendants - Appellants |

| **Originating Case Information:** |
|---|
| District Court No: 1:14-cv-06259 <br> Northern District of Illinois, Eastern Division <br> District Judge Robert W. Gettleman |

The judgment of the District Court is AFFIRMED IN PART, VACATED IN PART, and REMANDED for further proceedings consistent with the opinion. Each party shall bear its own costs for the appeal.

The above is in accordance with the decision of this court entered on this date.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit